**SHARPER IMAGE CORP., a Delaware corporation, Plaintiff,**

v.

**HONEYWELL INTERNATIONAL INC., et al., Defendants.**

**Sharper Image Corp., a Delaware corporation, Plaintiff,**

v.

**Kaz, Inc., a New York corporation, Defendant.**

**Nos. C 02–4860 CW(WDB), C 04–0529 CW(WDB).**

United States District Court, N.D. California.

July 28, 2004.

E. Robert (Bob) Wallach, Law Offices of
E. Robert (Bob) Wallach, San Francisco, CA,
Noelle J. Quinn, Alan L. Barry, Amy Gast
O'Toole, Bell, Boyd & Lloyd LLC, Chicago,
IL, Jeffrey W. Shopoff, Shopoff & Cavallo
LLP, San Francisco, CA, for Plaintiff.

Michael Arthur Hellwich, Munir R. Meghjee, Stacie Oberts, William H. Manning, Cole M. Fauver, Robins, Kaplan, Miller & Ciresi L.L.P., Minneapolis, MN, John P. Bovich, Jonah D. Mitchell, Reed, Smith, Crosby, Heafey LLP, San Francisco, CA, Ethan Glass, San Francisco, CA, Evan Michael Bundis, Darby & Darby, New York, NY, for Defendants.

## OPINION AND ORDER RE SCOPE OF WAIVER OCCASIONED BY DEFENDANT'S INVOCATION OF "ADVICE OF COUNSEL" DEFENSE TO CHARGE OF WILLFUL INFRINGEMENT

BRAZIL, United States Magistrate Judge.

In this opinion and order we address difficult questions about the scope of the waivers[1] of the attorney client privilege and the work product doctrine that are occasioned by Kaz's decision to rely, in part,[2] on advice of counsel in defending itself against Sharper Image's allegation of willful infringement.

■ The issues we confront have not been resolved by the United States Court of Appeals for the Federal Circuit[3]—and have produced sometimes sharply divided views in federal trial courts.[4] I have discussed issues in this arena in two published opinions in

---

1. We use the plural form of the word here ("waivers") because the scope of the waiver of the attorney-client privilege and the scope of the waiver of work product protection might be different.

2. In deciding whether a defendant's infringement was "willful" or "in bad faith" the trier of fact must take into account "the totality of the circumstances." *American Medical Systems, Inc., v. Medical Engineering Corp.*, 6 F.3d 1523, 1530 (Fed.Cir.1993). Thus, in defending itself against a claim of willfulness, an infringer may point to a number of facts or circumstances in addition to, or in lieu of, an opinion from counsel. *See, e.g., SRI International, Inc., v. Advanced Technology Laboratories, Inc.*, 127 F.3d 1462, 1464–65 (Fed.Cir.1997).

3. In the subjects we address in this opinion, the United States Court of Appeals for the Federal Circuit is the source of authority that binds us (unless, of course, the Supreme Court has spoken on the matter) because, even though the issues are arguably not in arenas of "substantive" patent law, their disposition "is affected by the special circumstances of the patent law setting in which those issues arise." *Midwest Industries, Inc. v. Karavan Trailers, Inc.*, 175 F.3d 1356, 1359–60 (Fed.Cir.1999). Stated differently, the issues here clearly are not "totally unrelated to patent issues," but, instead, are "intimately involved in the substance of enforcement" of rights under the patent laws—such that permitting the separate views of other federal courts of appeals to dictate their disposition would "impinge on the goal of patent law uniformity." *Flex–Foot, Inc. v. CRP, Inc.*, 238 F.3d 1362, 1365 (Fed.Cir. 2001), and *Panduit Corp. v. All States Plastic Mfg. Co.*, 744 F.2d 1564, 1574 (Fed.Cir.1984).

4. While the courts generally agree that a defendant who invokes the "advice of counsel" defense to a claim of willfulness waives the protections of the attorney-client privilege for communications that occurred before the suit was filed and that relate to the subjects addressed in the invoked advice, there is considerable division of opinion about how far (if at all) the waiver extends to work product that counsel generated before the suit was filed but did not share with the defendant. *Nitinol Medical Technologies, Inc. v. AGA Medical Corp.*, 135 F.Supp.2d 212, 218–19 (D.Mass. 2000), *Steelcase Inc. v. Haworth Inc.*, 954 F.Supp. 1195, 1199 (W.D.Mich.1997); and *Thorn EMI North America, Inc. v. Micron Technology, Inc.*, 837 F.Supp. 616, 620–22 (D.Del. 1993), support the view that the protection of the work product doctrine is waived only as to material disclosed to the client. Opinions that support the view that the waiver can extend even to work product that was not communicated to the client include *Novartis Pharmaceuticals Corp. v. EON Labs Mfg., Inc.*, 206 F.R.D. 396, 399 (D.Del.2002); *Greene, Tweed of Delaware, Inc. v. DuPont Dow Elastomers, L.L.C.*, 202 F.R.D. 418, 420–422 (E.D.Pa.2001); *Electro Scientific Industries, Inc. v. General Scanning, Inc.*, 175 F.R.D. 539, 545–546 (N.D.Cal. 1997); *Mushroom Associates v. Monterey Mushrooms Inc.*, 24 U.S.P.Q.2d 1767, 1771 (N.D.Cal. 1992); and *Handgards Inc. v. Johnson & Johnson*, 413 F.Supp. 926, 929–31 (N.D.Cal.1976).

There also are sharp divisions of opinion about whether any waiver reaches into the period after the defendant was served with the complaint. *Compare, e.g., Motorola, Inc. v. Vosi Technologies, Inc.*, 2002 WL 1917256, *2 (N.D.Ill.2002); *Carl Zeiss Jena GmbH v. Bio–Rad Laboratories Inc.*, 2000 WL 1006371, *2 (S.D.N.Y.2000); and *Dunhall Pharmaceuticals, Inc. v. Discus Dental, Inc.*, 994 F.Supp. 1202, 1206 (C.D.Cal.1998), all limiting waiver to communications that preceded the

cases litigated some years ago [5] and I have entered an order in the case at bar that purported to resolve some of the issues raised by the pending motions. In the course of considering the remaining, more difficult issues, I have revisited the underpinnings of my earlier views and identified some additional considerations that courts should take into account in these settings. As a result, I have, in some measure, changed my mind about the scope of the waivers that attend a party's decision to invoke advice of counsel as a defense against an allegation of willful infringement.

■ It is important to emphasize that decisions about the scope of such waivers must be case and circumstance specific—and that analytically material differences in circumstances [6] may well justify different outcomes, even among courts that apply the same basic principles or use identical decision models.

## FACTUAL AND PROCEDURAL BACKGROUND

Kaz has received professional services related to this dispute from three different law firms.[7] The input it has received from counsel has covered a wide range of matters, from formal "opinion letters" about infringement to tactical advice about how to handle discrete parts of these related lawsuits. The only "advice of counsel" that Kaz will present during this litigation as part of its defense against Sharper Image's willfulness claim consists of an opinion letter from Wolf Greenfield, a law firm that has made no appearance in this litigation. This opinion letter [8] addresses only whether a specific product, Kaz's Environizer, infringes any of a limited number of specifically identified patents. The letter does not discuss validity or enforcement, and does not discuss any pending patent applications.

Nonetheless, Sharper Image contends that because Kaz has elected to invoke the "advice of counsel" defense Kaz has waived the protections of both the attorney-client privilege and the work product doctrine (1) "with respect to all counsel/firms" (even Kaz's separate trial counsel), (2) "all communications and/or work product" (whether shared with Kaz or not), (3) "whether generated before or after the lawsuit's filing," [9] (4) that relate to the subjects of infringement, validity, or enforceability, (5) of the patents in suit or of any patents or patent applications covering related or similar designs or technologies.

The portions of the factual and procedural background that are pertinent to the disposition of the pending disputes include the following. Sharper Image is the assignee of several patents that it accuses Honeywell and Kaz of infringing in this consolidated litigation. The principal product that Sharper Image accuses is an ionic air purifier called the "Environizer." The Environizer was developed by Honeywell and Kaz. Dur-

filing of the suit, *to the following cases,* all of which lend support to the view that, at least in some circumstances, waivers may extend to communications that occurred after the defendant was served with the complaint: *AKEVA L.L.C. v. Mizuno Corp.,* 243 F.Supp.2d 418, 423, (M.D.N.C.2003); *Chiron Corp. v. Genentech, Inc.,* 179 F.Supp.2d 1182, 1188–90 (E.D.Cal.2001); and *McCormick–Morgan, Inc. v. Teledyne Industries, Inc.,* 765 F.Supp. 611, 613–614 (N.D.Cal. 1991).

5. *Electro Scientific Industries, Inc. v. General Scanning, Inc.,* 175 F.R.D. 539, 545–546 (N.D.Cal.1997); and *McCormick–Morgan, Inc. v. Teledyne Industries, Inc.,* 134 F.R.D. 275 (N.D.Cal.1991), *rev'd in part by McCormick–Morgan, Inc. v. Teledyne Industries,* 765 F.Supp. 611, 613–614 (N.D.Cal.1991).

6. An example of an analytically material difference in circumstances appears in *BASF Aktienge-*

*sellschaft v. Reilly Industries, Inc.,* 283 F.Supp.2d 1000 (S.D.Ind.2003), where, during the pretrial period, the defendant changed, dramatically, the basis for its contention that the accused product did not infringe the plaintiff's patent rights.

7. Three additional law firms (Reed Smith, Howard Rice, and Patterson Belknap) apparently have rendered some service to Kaz and/or Honeywell in relation to these actions or the subjects they reach. Because their roles were so limited, however, we will discuss separately, and near the end of this opinion, the disposition of the issues that apply to them.

8. The letter is addressed to Stephen Gatchell, Director of Engineering at Kaz, and is dated July 23, 2002.

9. These three quoted phrases are from Sharper Image's Second Supplemental Brief, filed June 8, 2004, p. 6.

ing the first half of 2002 Honeywell negotiated the sale of its Consumer Products division to Kaz—a sale through which Kaz acquired Honeywell's rights in the Environizer.

While the negotiations were underway Honeywell retained Wolf Greenfield, a law firm that specializes in intellectual property, to perform a search for possibly related *design* patents and to form a preliminary opinion about whether the proposed form of the product that became the Environizer might infringe any of those design patents. Wolf Greenfield conducted the search and delivered an opinion letter to Honeywell on April 3, 2002. The letter expressed the conclusion that the design of the proposed product would not infringe any of the design patents that had been identified in the search.

The law firm of Darby & Darby had served as Kaz's outside counsel for a range of purposes for some time before the negotiations with Honeywell got underway. Darby & Darby advised Kaz during those negotiations. Darby & Darby also has assisted Kaz in prosecuting patent applications. At least by the time the negotiations were concluded, in late June of 2002, Honeywell, Kaz, and Darby & Darby knew about the *utility* patents that Sharper Image accuses the Environizer of infringing.

Before the sale by Honeywell to Kaz was consummated (in late June of 2002), and before Kaz decided to proceed with the commercialization of the Environizer, Kaz asked Wolf Greenfield to conduct a search of utility patents and to provide Kaz with an opinion about whether the Environizer would infringe any of the patents the law firm found. Wolf Greenfield conducted the requested search and provided Darby & Darby with a virtually final draft of its opinion letter in late June, 2002. Wolf Greenfield provided the final version of the opinion letter directly to Kaz on July 23, 2002. The letter described the search, set forth the applicable legal principles, compared Kaz's proposed product to the claims in the most pertinent patents, and articulated the conclusion that the Environiz-

er would infringe none of those claims. Darby & Darby reviewed the Wolf Greenfield opinion letter and expressed views about it to Kaz.[10] In September of 2002 Kaz proceeded to market the Environizer. Shortly thereafter, in October of 2002, Sharper Image filed and served the complaint that initiated this litigation. In that complaint Sharper Image alleged that, in marketing its Environizer, Kaz was infringing specified utility patents and was doing so willfully.

Initially, Darby & Darby represented Kaz in this court. But soon after the inception of the litigation Kaz also retained the firm of Robins, Kaplan, Miller & Ciresi (Robins Kaplan) to participate in the defense of these cases. In late 2002 Kaz filed a formal request for substitution of attorneys, replacing Darby & Darby as its trial counsel with Robins Kaplan. It appears from the docket that since then virtually all of the litigation work in these matters has been done by Robins Kaplan—with Darby & Darby performing only a very secondary, advisory function.

Sharper Image and Kaz are competitors. Kaz has continued to sell its Environizer despite the pendency of this litigation. Moreover, in September of 2003 Kaz introduced a second product in this field, a product that it calls the Environizer Ultra. Earlier this year Sharper Image filed an action that accuses this more recent Kaz product of infringing Sharper Image patents. That second action is part of these consolidated proceedings, but our focus at this juncture is limited to the original version of the Environizer and the utility patents that Sharper Image initially claimed the Environizer infringed (the deadline for Kaz to decide whether to invoke the advice of counsel defense in response to Sharper Image's claims that Kaz also has willfully infringed its patent rights by marketing other products has not arrived).

Kaz has applications pending for patents that apparently would cover some aspects of its Environizer products.[11]

---

10. Counsel for Kaz has informed the court that Darby & Darby communicated its views to Kaz about the Wolf Greenfield opinion letter only orally, not in any writing.

11. As we discuss in a subsequent section of this opinion, it is significant that Sharper Image and Kaz are competitors and that Kaz is prosecuting applications for patents whose claims apparently

## THE "ADVICE OF COUNSEL" THAT KAZ HAS PUT IN ISSUE

In defending itself against Sharper Image's allegations of willful infringement, Kaz has elected to rely, in part, on the July 23, 2002 opinion letter from Wolf Greenfield. That opinion letter (and the draft that Wolf Greenfield shared with Darby & Darby about a month earlier) addressed only the question of whether the Environizer, as then configured, would infringe any of the identified patents. The Wolf Greenfield letter did not discuss the validity or enforceability of the Sharper Image patents. Nor did it consider any version of the Environizer other than the model that Kaz and Honeywell had then developed. Thus, up to this point, Kaz has elected to use in this litigation the "advice of counsel" defense only with respect to the issue of *infringement* of the utility patents in suit and only with respect to the original version of the Environizer.

## EARLIER RULINGS

During and after the oral argument on these discovery disputes, but before the parties submitted rounds of additional briefing, the court issued orders that addressed some (but not the most difficult) of the contested matters.[12] Most of the disclosures that I ordered at that earlier stage fall within widely accepted boundaries, boundaries that are rooted in the notion that it would be unfair to permit a defendant to contend that its reliance on an opinion from counsel evidenced its good faith without giving plaintiff access to the evidence necessary to test the bona fides of that alleged reliance (i.e., did the defendant in fact rely on the advice and was any such reliance reasonable).

The court has changed its mind, however, about one aspect of the orders it entered in May. For reasons explained below, the court hereby VACATES paragraph number three (3.) of the "Order Following May 13, 2004, Hearing on Plaintiff's Motion to Compel," filed May 14, 2004, and REPLACES THAT PARAGRAPH WITH THE FOLLOWING DIRECTIVE: Kaz must disclose all communications (through any medium and in any form) from Wolf Greenfield to Kaz or Honeywell that relate to whether the Environizer might be deemed to infringe any claim in any of the patents in suit.

The earlier orders that we leave in full force are limited in several important ways. First, their temporal reach does not extend past the date (in October of 2002) that Sharper Image filed the first of these consolidated cases. Second, they reach only communications or documents related to the patents in suit. Third, the communications or documents whose protections we earlier determined must be forfeited are limited to those made to, from, or by Wolf Greenfield. Thus, the earlier orders did not address the more controversial and challenging issues to which we devote most of this opinion: whether the waiver should reach past the date the law suit was filed, whether it should extend in some measure to patents or applications other than those in suit, and whether it should cover some communications to or from, or some undisclosed documents generated by, any of the other lawyers (outside the offices of Wolf Greenfield) who have performed professional services for Kaz or Honeywell in this litigation or that are in some other way

reach some of the aspects of the products in dispute here. In resolving discovery disputes in settings like these, courts should be sensitive to the possibility that a party might try to use an allegation of willful infringement as a vehicle to gain access to competitively sensitive materials related to pending patent applications. In these kinds of settings, courts should attend not only to the law of privilege and waiver, but also to the policy objectives Congress sought to advance when it empowered parties to insulate certain patent application materials from public view.

**12.** To accurately understand the limits of those earlier orders it is necessary to review both the

transcript of the oral proceedings and the summary written Order the court filed on May 14, 2004. The court orally imposed limits on Kaz's duty to disclose that are not reflected in the written Order.

As indicated in the next paragraph of the text, above, I have changed my mind about one of the categories of documents in the May 14th Order. For reasons that will be explained, I have concluded that Kaz should not be compelled to disclose otherwise protected communications that are not about infringement but, instead, focus on validity or enforceability.

related to the accused products or the patents in suit.

Thus limited, our earlier orders required Kaz to disclose: (1) any communication from Kaz or Honeywell to Wolf Greenfield about the scope or nature of the opinion or advice that Kaz or Honeywell sought about whether the Environizer infringed any of the patents in suit; (2) any information, views, directions, suggestions, or questions that Kaz or Honeywell communicated to Wolf Greenfield as it went through the process of developing the advice or opinion that Kaz or Honeywell sought; (3) the content of any advice given or any opinion communicated (in writing or orally, through any medium) by Wolf Greenfield to Kaz or Honeywell about whether the Environizer might be deemed to infringe any of the patents in suit; (4) any opinion formed by Wolf Greenfield (even if not communicated to a client) about whether the Environizer infringed any of the patents in suit, and anything Wolf Greenfield consulted or considered in connection with developing any such opinion; (5) anything Kaz or Honeywell learned from Wolf Greenfield about the bases for any views Wolf Greenfield communicated about whether the Environizer infringed any of the patents in suit—or about the process through which Wolf Greenfield formed any such opinions; (6) any thoughts Kaz or Honeywell had, or any actions either entity considered or took, in reaction or response to any advice or opinion from Wolf Greenfield about whether the Environizer infringed any of the patents in suit; (7) any communication from Kaz or Honeywell to Wolf Greenfield in response or reaction to advice or opinions from Wolf Greenfield about whether the Environizer infringed the patents in suit; and (8) any communications with anyone else that reflect or evidence any of the above.

## THE PERTINENT PRINCIPLES OF PATENT LAW

The analysis we use to resolve the difficult issues about the scope of the waivers that this dispute raises must be grounded in and responsive to the relevant principles of patent law. Generic waiver doctrine is not sufficient; we increase our risk of error if we simply rely on generalizations imported from other subject-matter settings. This follows, at least in part, because the concept on which reasoning about the scope of waiver primarily turns is "fairness"—but in a setting like this what constitutes "fairness" is not simply a function of abstractions about notice and about procedural opportunities and balance. Instead, reliable reasoning about what is "fair" must be infused throughout by a clear and specific understanding of what the substantive principles of patent law will require plaintiff and defendant to try to prove when they litigate the issue of willfulness. So we begin by attempting to identify the substance of those burdens.

In the statutes that authorize remedies for patent infringement, Congress declared that, after compensatory damages have been determined, "the court may increase the damages up to three times the amount found or assessed." 35 U.S.C. § 284. The purpose of so empowering district judges is to provide them with a tool they can use, in their discretion, to punish and to deter conduct that was more threatening to the patent system than naked acts of infringement. A judgment of infringement, without more, is imposed under a standard of strict liability. The purpose of empowering judges to enhance damages is to equip them to respond appropriately when the defendant's conduct moved beyond mere liability and into the zone of culpability.[13]

13. Some of the cases have suggested that an additional purpose of providing for enhancement of damages could be to increase the likelihood that the award a plaintiff receives will fully compensate him for all the harm he has suffered—acknowledging that in some patent litigation it can be very difficult to measure and prove damages reliably. Some opinions cast this consideration in terms of enhancing the court's ability to re-establish an appropriate balance of the equities between the parties. But it is clear that this purpose is entirely secondary—and cannot, standing alone, justify any enhancement of damages. See Beatrice Foods Co., v. New England Printing & Lithographing Co., 923 F.2d 1576 (Fed.Cir.1991). The primary purposes of enhancing compensatory damages are punishment and deterrence—and the primary factors courts are to consider when deciding whether to enhance damages are designed to assess the degree of the defendant's culpability (rather than the extent of the plaintiff's loss.)

But Congress has not tried to define or articulate what kind of culpability is sufficient to justify imposition of a penalty, i.e., some enhancement of the compensatory damages. Congress did not use the word "willful" or the phrase "bad faith" in the pertinent statute. In fact, Congress did not use any word to try to capture the state of mind, or the kinds of circumstances, that would make imposing some penalty (within the range Congress authorized) appropriate. Congress did not even identify criteria or factors judges might take into account when deciding whether to enhance damages and by how much.

 Left by Congress to their own devices, courts have tried to fill the statute's definitional and guideline void. The word that has emerged most prominently from this quasi-common law process is "willfulness."[14] Thus, it is commonly said that a determination of "willfulness" (or "bad faith" or "wanton disregard of the patentee's patent rights") is a necessary predicate for imposition of enhanced damages.[15]

What does the word "willful" mean in this setting? What is the target of the factfinder's inquiry when trying to decide whether the patent holder has proved (by clear and convincing evidence) that the defendant's infringement was "willful"? These questions have not yielded tidy and compact answers— a fact that reflects, among other things, the complexity of the environments in which these questions often are addressed, the clash of competing policies at play in this arena, and the reality that there rarely is direct evidence of the pertinent "state of mind" of commercial entity defendants.

Some of the uncertainty about what "willfulness" means is attributable in part (but only in part) to the fact that some courts and commentators have failed to keep clearly separate two related but not coterminous or identical inquiries: (1) was the infringing conduct willful, and (2) if so, should the damages be enhanced (and by how much)?

 When the judge (not the jury) decides whether to *enhance* damages (something she can do only if the jury first finds that the infringing conduct was "willful"), she is taught to take into account the totality of the circumstances, including both factors that render the defendant's conduct more culpable and factors that make that conduct less culpable. The Court of Appeals for the Federal Circuit has identified at least nine different factors or circumstances that trial judges should consider when they are deciding whether to enhance damages,[16] including

---

14. The phrase "bad faith" is sometimes used by . courts when they are justifying a decision to enhance damages. It is important, however, to distinguish "bad faith" conduct of litigation from culpability accompanying the infringing conduct itself. *See, e.g., Jurgens v. CBK, Ltd.,* 80 F.3d 1566, 1570–71 (Fed.Cir.1996). "Bad faith" conduct of litigation, standing alone, can justify imposition of a sanction or penalty—but there are clearer sources of authority for sanctioning conduct of litigation when the only "wrong" inferred from that conduct is violating rules about how litigation is to be handled. See, e.g., 28 U.S.C. § 1927 and F.R.Civ.P. 11, 26, and 37.

In some circumstances, however, bad faith conduct of litigation might be viewed as evidence of another wrong, that is, evidence that the acts of infringement were "willful" or "in bad faith." For example, a judge might conclude that a party intentionally (and in "bad faith") delayed the pretrial process—and that the party who engaged in the delaying tactics did so as part of a larger scheme designed to keep its accused product on the market longer, understanding all along that there was a great likelihood that the accused product would be found to infringe the plaintiff's patent rights.

15. The roles of the jury and the judge in this arena are curiously blended. At a general level, the courts insist that the question of whether the defendant's conduct was "willful" is a question of fact—thus to be determined by the jury (unless the parties have agreed that the judge is to be the trier of fact). *See Vulcan Engineering Co., Inc. v. Fata Aluminium, Inc.,* 278 F.3d 1366, 1378–79 (Fed.Cir.2002); *Biotec Biologische Naturverpackungen GmbH v. Biocorp, Inc.,* 249 F.3d 1341, 1356 (Fed.Cir.2001).

The courts also agree, however, that a jury determination of this "fact" question is only advisory—meaning that a judge is not required to enhance damages even if a jury finds by clear and convincing evidence that the infringement was willful. *See Riles v. Shell Exploration & Production,* 298 F.3d 1302, 1314 (Fed.Cir.2002). Thus, whether to impose an enhancement and, if so, by how much, is committed to the sound discretion of the trial judge.

16. *See, e.g., Read Corp. v. Portec, Inc.,* 970 F.2d 816, 828 (Fed.Cir.1992), *abrogated in part on other grounds by Markman v. Westview Instruments, Inc.,* 52 F.3d 967 (Fed.Cir.1995) (en

many that could help inform a judgment about whether the infringing conduct was "willful." For example, in deciding whether to enhance damages—after a jury has found that the defendant's conduct was willful—a judge may consider, among other things, (1) whether the infringer deliberately copied the patented matter, (2) the defendant's motivation for harm, (3) whether the defendant attempted to conceal its misconduct, (4) what steps (if any) the defendant took, upon learning about the patent, to try to determine whether the accused product in fact infringed the plaintiff's rights under the patent, (5) how long the defendant continued to engage in the infringing conduct after it knew about the patent in question, and (6) whether the defendant voluntarily stopped marketing the accused product during the pendency of the litigation, or took any other steps to reduce the extent of the harm plaintiff might suffer from the allegedly infringing activity.

■ The potential for confusion about what "willfulness" means is exacerbated by the fact that this determination also is to be based on "the totality of the circumstances." *Odetics Inc. v. Storage Technology Corp.*, 185 F.3d 1259, 1274 (Fed.Cir.1999). Courts often say, in this context, that the target of the willfulness inquiry is the state of mind of the alleged infringer[17]—but the authorities make it clear that a plaintiff can prevail on a willfulness allegation without proving that the defendant was knowingly and intentionally (i.e., self-consciously) invading the patentee's rights. A showing of "wanton" or "reckless" disregard of the patentee's rights

clearly would be sufficient[18] (e.g., if the defendant knew that there was a strong possibility that its product infringed the plaintiff's patent but elected, in the face of that actual knowledge, to continue selling the accused product without investigating the matter and without seeking a competent advisory opinion).

Moreover, it is clear from the authorities that "willfulness" can be found even if the evidence is *not* sufficient to enable the fact finder to determine what subjective state of mind actually accompanied the defendant's infringing conduct. Thus, despite the connotation of "subjectiveness" in the term "willful," a plaintiff apparently could prove that the defendant's conduct was "willful" by making the less demanding showing that "a prudent person would [not] have had sound reason to believe that the patent was not infringed or was invalid or unenforceable." *SRI International, Inc., v. Advanced Tech. Labs., Inc.*, 127 F.3d 1462, 1465 (Fed.Cir. 1997). *See also Ryco, Inc. v. Ag–Bag Corp.*, 857 F.2d 1418, 1428 (Fed.Cir.1988); *Central Soya Co., Inc. v. Geo. A. Hormel & Co.*, 723 F.2d 1573, 1577 (Fed.Cir.1983). So, while the target of the willfulness inquiry remains in some sense the state of mind of the alleged infringer, the courts seem prepared to permit a plaintiff to prove "willfulness" under either a subjective or an objective standard. And at least some judicial articulations of the kind of showing that could satisfy the objective standard seem to move the inquiry into perilous proximity to mere negligence.[19]

---

banc); and *Bott v. Four Star Corp.*, 807 F.2d 1567, 1572 (Fed.Cir.1986), *overruled on other grounds by Aukerman Co. v. R.L. Chaides Construction Co.*, 960 F.2d 1020 (Fed.Cir.1992).

17. *Read Corp. v. Portec*, 970 F.2d 816, 827 (Fed. Cir.1992), *abrogated in part on other grounds by Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed.Cir.1995) (en banc); *Gustafson, Inc. v. Intersystems Indus. Products, Inc.*, 897 F.2d 508, 510 (Fed.Cir.1990).

18. *Read Corp. v. Portec*, 970 F.2d 816, 826 (Fed. Cir.1992), *abrogated in part on other grounds by Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed.Cir.1995) (en banc).

19. *See, e.g., Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1580 (Fed.Cir.1992), where, quoting *Ryco,*

*Inc. v. Ag–Bag Corp.*, 857 F.2d 1418, 1428 (Fed. Cir.1988), the court indicated that in determining willfulness the issue is whether, given all the circumstances, a "reasonable person would prudently conduct himself with any confidence that a court might hold the patent invalid or not infringed." *See also Underwater Devices Inc. v. Morrison–Knudsen Co., Inc.*, 717 F.2d 1380, 1389 (Fed.Cir.1983), where the court, upholding a trial judge's decision to impose treble damages, endorsed the earlier developed notion that where "a potential infringer has actual notice of another's patent rights, he has *an affirmative duty to exercise due care* to determine whether or not he is infringing." (Emphasis added). "An affirmative duty to exercise due care" sounds a lot like the standard for negligence in common law tort actions (unless courts read a great deal more than is obvious into the word "affirmative").

■ It also is significant that courts commonly acknowledge that willfulness exists in degrees.[20] This notion may come into play most often when a judge is deciding whether to enhance damages and, if so, to what extent; given the punitive and deterrent purposes of such exercises, the extent of the damages enhancement should be proportional to the extent of the defendant's culpability. But the idea that willfulness is a matter of degree also applies to the predicate determination by the trier of fact of whether the infringing conduct was "willful." Moreover, the acknowledgment that willfulness exists in degrees highlights a reality of litigation life that is of considerable consequence to litigants. "Willfulness," as an issue of fact, often will not be a matter of clearly separated black and white. Instead, it will be a matter of shades, of greys—and it is extremely difficult to predict the precise place, on what in many instances will be a blurred continuum, the trier of fact will decide to draw the line.

These realities, in the context of the looseness and non-linearity of the "totality of the circumstances" test, and the courts' acknowledgment of the absence of "hard and fast rules" in this arena,[21] give the concept of "willfulness" an elasticity that could have a considerable *in terrorem* effect on defendants. While this effect might be moderated in some measure by the requirement that willfulness be established by clear and convincing evidence,[22] there are many additional uncertainties in patent litigation (some of which we describe below) that are likely to more than offset this moderating influence and that can magnify sometimes dramatically the fear-based pressures that an accusation of willfulness can impose on a defendant accused of patent infringement.

■ While the courts have acknowledged that a considerable number of circumstance-specific factors or circumstances could be probative of whether a defendant's infringement should be deemed "willful,"[23] for our purposes what is most significant is the widely shared perception (reinforced by considerable comment in cases) that in the willfulness equation the weightiest single factor often will be whether, upon learning about the patents in question, the defendant sought advice of counsel and received a "competent" opinion either that his product did not infringe or that the patent would be deemed invalid or for some other reason unenforceable.[24]

---

**20.** *See Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1190 (Fed.Cir.1998), quoting from *Rite–Hite Corp. v. Kelley Co., Inc.*, 819 F.2d 1120, 1125–26 (Fed.Cir.1987), "willfulness, as in life, is not an all-or-nothing trait, but one of degree. It recognizes that infringement may range from unknowing, or accidental, to deliberate, or reckless, disregard of the patentee's legal rights."

**21.** *Graco, Inc. v. Binks Mfg. Co.*, 60 F.3d 785, 792 (Fed.Cir.1995); *Electro Medical Systems, S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1056–57 (Fed.Cir.1994).

**22.** *Gustafson, Inc. v. Intersystems Indus. Products, Inc.*, 897 F.2d 508, 510–511 (Fed.Cir.1990).

**23.** As noted, above, many of the factors the authorities permit judges to consider when deciding whether to enhance damages also could be probative on the willfulness question, e.g., whether it appears that the defendant copied the plaintiff's patented product, whether the defendant's conduct was motivated by animus toward plaintiff, how clear it was that the accused product infringed plaintiff's patent rights, what steps defendant took, after being on notice of the patent, to determine whether his product was likely to be deemed to infringe, etc. *See, e.g., Read Corp.*

*v. Portec, Inc.*, 970 F.2d 816 (Fed.Cir.1992), *abrogated in part on other grounds by Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed.Cir. 1995) (en banc); *Bott v. Four Star Corp.*, 807 F.2d 1567 (Fed.Cir.1986), *overruled on other grounds by Aukerman Co. v. R.L. Chaides Construction Co.*, 960 F.2d 1020 (Fed.Cir.1992).

**24.** In *Comark Communications, Inc. v. Harris Corporation*, 156 F.3d 1182, 1190 (Fed.Cir.1998), the Court of Appeals for the Federal Circuit declared: "As a general matter, a potential infringer with actual notice of another's patent has an affirmative duty of care that usually requires the potential infringer to obtain competent legal advice before engaging in any activity that could infringe another's patent rights." After noting that other circumstances and considerations also could be probative on the issue of willfulness, the same court went on to observe that "[I]t is well settled that an important factor in determining whether willful infringement has been shown is whether or not the infringer obtained the opinion of counsel .... However, the legal opinion must be 'competent' or it is of little value in showing the good faith belief of the infringer."

Also see the cases cited and the discussion of this matter in Powers and Carlson, "The Evolu-

When a party learns about a patent that his product might be deemed to infringe, patent law imposes on him a duty of due diligence—a duty to undertake an investigation to determine, in good faith, whether his product in fact infringes (or whether the patent is invalid or otherwise unenforceable). *Bott v. Four Star Corp.,* 807 F.2d 1567, 1572 (Fed.Cir.1986), *overruled on other grounds by A.C. Aukerman Co. v. R.L. Chaides Construction Co.,* 960 F.2d 1020 (Fed.Cir.1992); *Underwater Devices Inc. v. Morrison–Knudsen Co.,* 717 F.2d 1380, 1389 (Fed.Cir.1983). And at least for products or processes that involve some subtlety or complexity, it has become extremely difficult to discharge this duty of due diligence without securing (and relying on in litigation) an independent legal opinion that marketing the accused product does not invade enforceable patent rights.

If, during trial, an accused infringer does not introduce an exculpatory opinion from counsel, the trier of fact "must be free to infer that either no opinion was obtained or, if an opinion were obtained, it was contrary to the infringer's desire to initiate or continue its use of the patentee's invention." *Fromson v. Western Litho Plate and Supply Co.* 853 F.2d 1568, 1572–73 (Fed.Cir.1988). The availability of such a negative inference looms large in contemporary patent litigation—virtually compelling defendants in cases involving sophisticated products or processes to secure and disclose independent advice of counsel. *Johns Hopkins University v. Cellpro,* 160 F.R.D. 30, 34 (D.Del.1995). Thus, the principles of contemporary patent law impose sometimes enormous pressure on defendants to disclose such advice—and, thereby, to waive protections they otherwise would enjoy under the attorney-client privilege and the work product doctrine.

Because the waivers with which the law is generally most comfortable are truly voluntary, and because substantive patent law has evolved in a direction that injects a substantial element of involuntariness into waivers in the setting we address here, courts should be careful not to define the scope of these waivers more broadly than is justified by the fairness objectives on which waiver doctrine is supposed to turn.

Before proceeding, we also must try to understand what legal and factual issues are brought into play by a defendant's invocation of "advice of counsel" in response to an allegation of willful infringement. Initially, the defendant must show, of course, that he actually received pertinent advice from counsel. Then he must try to persuade the jury (or judge) that, as a matter of historical fact, he "relied" on that advice. Finally, and most significantly, he must demonstrate that, given the content and character of the advice, everything else he knew or should have known, and the totality of the circumstances, it was reasonable for him to so rely. These burdens arise from the duty a defendant acquires, after learning about an apparently relevant patent, to determine in good faith and with "due diligence" whether proceeding with his activities would invade another party's rights under a patent. *See Underwater Devices Inc. v. Morrison–Knudsen Co.,* 717 F.2d 1380 (Fed.Cir.1983), and its many progeny.

As the word "reasonable" implies, the test here is objective. The principal focus of the inquiry is on what a reasonably prudent person, similarly situated, would have done. Would such a hypothetical person have concluded, given all the circumstances, that the advice he received was legally reliable? *See, e.g., Graco, Inc. v. Binks Mfg. Co.,* 60 F.3d 785, 793–94 (Fed.Cir.1995); and *Westvaco Corp. v. International Paper Co.,* 991 F.2d 735, 743 (Fed.Cir.1993). Many factors could come into play when the parties litigate this issue, including, among others, the historical relationship between defendant and plaintiff (former employer or partner, competitor, etc.), the level of the defendant's sophistication (especially about patent issues),[25] what led the defendant to seek the advice (e.g., the initiation of the litigation or a long term, extensively financed effort to design around the patent in question), when (in

tion and Impact of the Doctrine of Willful Patent Infringement," 51 Syracuse L.Rev. 53, 77–83 (2001).

**25.** *See, e.g., Johns Hopkins University v. Cellpro, Inc.,* 152 F.3d 1342, 1364 (Fed.Cir.1998).

relation to the development or marketing of his product) the defendant secured the advice, how much the defendant understood about the patent in question and about the products it allegedly protected, input he received from others about the quality and content of the legal advice on which he allegedly relied, the magnitude of the plaintiff's interests that would be threatened by the accused activity and the significance to defendant of not being able to continue that activity (the parties' economic stakes).

There is one other factor, however, that in many cases will overshadow all the others: the character and quality of the advice itself (usually an opinion letter). The shorthand phrase the courts most often use to identify the target of inquiry in this setting is whether the advice (opinion) was "competent." *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1191 (Fed.Cir.1998); *Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1571–72 (Fed.Cir. 1996). This term is misleading, however, to the extent that it suggests that the focus should be on the professional quality of the private process through which the lawyer developed the opinion she communicated to her client, or on whether the opinion was "correct" (measured against the views of other professionals/experts or, after the fact, against the findings at trial). Considered together, the authorities indicate that neither of these considerations are appropriate measures, in this setting, of the "competence" of the advice.

This follows because the reasonableness that is being assessed is of the client, not the lawyer. So the focus should be on how a reasonable client, similarly situated, would view the advice she received—whether it was reasonable for her to view the opinion as "competent." In pursuing this question, what is most important is what the client could see, what the client knew, and whether the client should have been satisfied or should have asked for more.

██ Some courts also have used the word "objective" to characterize the kind of advice on which a defendant might reasonably rely. *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1191 (Fed.Cir.1998); *Minnesota Mining & Mfg. Co. v. Johnson &*

*Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1580 (Fed.Cir.1992). As used here, the term "objective" apparently implies two characteristics of the advice: (1) it's source (the lawyer) was independent of its recipient (the defendant) and (2) it was based, visibly, on reliably ascertained facts. The authorities make it clear, however, that advice need not always be "independent" to be deemed "competent," that, in some circumstances, a trier of fact could conclude that a defendant's reliance on the advice was reasonable even if the source of the advice was in-house. And visibly accurate factual predicates clearly are not sufficient to make reliance on an opinion reasonable; a reliable opinion about infringement requires counsel to apply to the "reliably ascertained" facts the relevant legal principles in close, disciplined, logical reasoning.

In short, the courts have not been able to capture in a single term all the qualities that advice of counsel should display when assessed in this context. That is hardly surprising, given the range of circumstances in which these issues are litigated. What is clear, however, is that what is likely to be most significant (in addition to counsel's independence and what the defendant knew about the extent of her relevant experience) is the apparent thoroughness and care of both the investigation and the reasoning that inform the opinion as rendered. What did the defendant know about the information that flowed to the lawyer as she was developing her opinion? What did the defendant know about how the questions were posed to the lawyer—and about how the lawyer framed her inquiries and shaped her task? What did the defendant know (most obviously, what was disclosed in the opinion letter) about how thorough the lawyer's investigation was and about the degree of care the lawyer took in identifying the truly pertinent legal principles? What can the defendant see about the accuracy and comprehensiveness of the data and facts to which the lawyer applied the legal principles? How tight, linear, and persuasive does the lawyer's reasoning appear? Does the analysis reflect sufficient nuance? Does it squarely acknowledge, then assess with apparent ob-

jectivity, possible competing views or lines of reasoning? Does it advert to reported opinions or outcomes in other litigation—and does it adequately take into account the implications of those other proceedings? Whether the advice in issue could support reasonable reliance is likely to turn primarily on these kinds of questions, questions that focus principally on what the defendant knew and didn't know.

## THE ROLE OF THE SOCIOLOGY OF PATENT LITIGATION IN DETERMINING THE SCOPE OF THE WAIVERS

Necessarily, much of patent litigation consists of word gaming. I say "necessarily" because patents are made of words—and it is on the meaning of words that the existence and scope of patent rights turn.

Moreover, at least up to this point in our evolution, much of our verbal activity is infected by some measure of indefiniteness—made inescapable by the complexity of the realities we encounter and by our limitations: limitations in our understanding, in our ability to discriminate, in the flexibility and subtlety of the languages we have developed, and in the extent of the vocabularies our brains are able to command.

These "inherent" limitations and imprecisions are exacerbated in the play between human nature and the patent system. Human nature supplies us with the capacity for greed and fear—with the desire to extend our power over our fate and to fortify our protections against . . . everything, but especially against those who might try to take what we have or prevent us from getting what we want.

From beginning to end, the patent system gives these fundamental human instincts great play. This fact is reflected in the mutually exclusive purposes that often are at work when patent applications are crafted.

On the one hand, the drafter seeks to describe the invention in terms sufficiently precise and narrow to assure issuance and validity. Simultaneously, however, the drafter is looking ahead and trying to use words that will cast the preclusive net of the patent as far as possible—in order to maximize the potential for economic return. The tension between the simultaneous desires for narrowness and for breadth can lead to calculated (or uncalculated) linguistic (or diagramatic) imprecision, to internal inconsistencies within a patent, or both. These forces compound, sometimes greatly, the indefiniteness or ambiguity that would attend even a straightforward linguistic attempt to capture physical reality.

Given all these considerations, and the increasing complexity of subject matters to which patents speak, there often is an element of arbitrariness in the process by which parties, lawyers, juries and judges try to fix the boundaries of patents.[26] There are always distinctions, but which of these will be deemed to make a legal difference? Where will the line be drawn, and by what criteria, between the distinctions that matter and those that do not? The extent of the arbitrariness (and unpredictability) that attends the process of answering these questions may vary considerably between different patents, but it probably is fair to say that in most cases that are seriously litigated this element of the outcome equation (arbitrariness and unpredictability) is substantial. Sophisticated litigants understand this fact—and may develop litigation strategies designed either to reduce it or to capitalize on it (leveraging the arbitrariness in their favor), or both.

Nor are these problems confined to the arena of infringement. In fact, they arguably are compounded when the parties litigate validity and enforceability. Litigation in these arenas often requires the parties and the court to make many more comparisons

---

**26.** I have experienced this arbitrariness first hand as the trier of fact in patent cases. After working as hard as possible to develop a reasonable understanding of the words and concepts in the claims, there always seems to be some space, a gap, between those words/concepts and the judgment about whether they cover the accused product. After I have reached the end of my analytical (semantic/conceptual) rope, I always seem to be required to make a leap (it varies in length) over that gap. This kind of experience is a sobering reminder of the limits of linear reasoning in our system of justice.

than are necessary when litigating infringement, and when these defenses are raised what is being compared to the patent usually is appreciably more elusive or elastic than an accused product. When contesting validity, for example, the parties often are analyzing the relationship between the patent in issue and "prior art." Prior art may include earlier issued patents, patents crafted under the same kinds of constraints and with the same mutually exclusive purposes as the patent in suit. So when these comparisons are undertaken, there are both calculated and inadvertent indefinitenesses on both sides.

The targets of inquiry can be even murkier when enforceability is litigated. When the issue is alleged fraud on the patent office, for example, the targets of "exposition" may include not only the words in the patent application and the words in earlier issued patents, but also what the patent applicant thought, or should have thought, about the relationship between those packages of words.

There is another significant feature of the backdrop against which patent litigation occurs. Because encouraging invention (advancement in the practical and the scientific "arts") is the key policy driver of the patent system, *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 481, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974), the law encourages efforts by newcomers to a field to "design around" existing patents. *State Indus., Inc. v. A.O. Smith Corp.*, 751 F.2d 1226, 1235–36 (Fed.Cir.1985). See also the cases cited and the discussion of this matter in Powers and Carlson, "The Evolution and Impact of the Doctrine of Willful Patent Infringement," 51 Syracuse L.Rev. 53, 77–83 (2001).

But as the subjects that patents cover become increasingly complex, specialized, or esoteric, it becomes increasingly difficult to predict which changes, or which additional or different elements, will be deemed sufficient to have successfully skirted an existing patent's boundaries. Because the effort to "design around" is to be encouraged, however, the policy makers want parties who are interested in entering a field to secure advice of counsel as they go about designing new products—advice that should help them deter-

mine when their commercial ship is avoiding the shoals. Moreover, another element of uncertainty, or another source of semantic strain, can be injected into the litigation dynamic by the fact that the author of such advice often understands well enough the hopes of the person who has solicited it.

Another factor of considerable real world consequence in some cases warrants mention here. Because litigating an intellectual property case in federal court is so expensive, cases that proceed past the preliminary stages usually involve asserted rights or underlying interests to which one or more of the parties attaches considerable economic value. In the majority of fully litigated patent cases at least someone thinks a lot of money (or the survival of the company) is at stake. A party who believes that a great deal is at stake often is prepared to spend a lot of money on litigation. So in many patent cases the expense of litigating does not serve as a significant source of discipline or restraint on the lawyers or the parties. Relatively unrestrained, they fight.

And the room that patent litigation gives them for fighting is considerable—in large measure because of the arbitrariness, the unpredictability, and the elusiveness of the subjects on which they work. That same unpredictability fuels yet another source of energy for the fray: fear. This fear can drive an almost desperate search for leverage on the uncertainties.

The effect of these characteristics of patent litigation is to put an extraordinary premium on the meaning of words. Often the center of the struggle is the effort to persuade the judge and the jury (and, for settlement, the opposing side) to choose among the competing definitions of terms those that support the advocating party's position. In part because of the indefiniteness and malleability of their subjects, and in part because of the arbitrariness at the final stage in the judgment process (and the consequent closeness of the call), lawyers and parties in these kinds of cases attach great significance to how (i.e., in which words) arguments or positions are presented and to how concepts are verbally packaged and explained.

Because they believe that so much turns on choices of words and lines of reasoning, lawyers and parties to patent litigation have an intense desire to know, in advance, which words their opponents will use and how (verbally) they will package (frame) their interpretative contentions. The acuteness of their concern about how their opponent will play the word game is the incentive that drives many patent lawyers to seek the deepest and most thorough intrusions possible into the minds of opposing counsel and client. Courts determining the scope of waiver must be aware of that drive and must take care not to craft doctrine either that intensifies it or that equips one side to gain unfair advantages over the other in their semantic battles. The parties surely would perceive that such an advantage had been gained if the lawyers on one side of the case were permitted to rummage freely around in the confidential trial preparation communications between an opponent and his trial counsel while the lawyers on the other side were not.

Before turning to the specifics of the disputes that remain between Kaz and Sharper Image we must identify, briefly, a few additional facts of patent litigation life that courts cannot afford to ignore when considering scope of waiver issues. The first such fact is that in many patent cases, the parties are competitors or potential competitors. That fact intensifies not only their general incentives to litigate vigorously but also their interest in invading one another's minds—searching for secrets about how things are done in the present and what the plans are for the future.

The second fact is that heavily litigated patent cases often involve very large damage claims—and the amount of pressure a defendant is under from exposure to treble damages obviously increases with the magnitude of the likely compensatory award.

The third fact is that in patent litigation a finding of willfulness often is the stepping stone to an award of attorney's fees. *Kori Corp. v. Wilco Marsh Buggies & Draglines,* 761 F.2d 649, 657 (Fed.Cir.1985). The knowledge that in patent cases these fees can be enormous intensifies the already considerable pressure on a defendant facing a willfulness claim.

The fourth fact is that there often are no significant barriers to adding an allegation of willfulness to a complaint for patent infringement. Unless the gap between the claims in the patent and the accused product is substantial and obvious, an allegation of willfulness is unlikely to be vulnerable to dismissal by motion or to Rule 11 sanctions. And since an allegation of willfulness can impose great pressure on defendants and can create unique opportunities for plaintiffs to invade provinces otherwise off limits (confidential communications between client and lawyer and the lawyer's work product), there are substantial incentives to add such an allegation to a complaint—even if there is no evidentiary foundation for it. As a result, allegations of willfulness have become almost a standard feature of complaints sounding in infringement.[27]

Courts should attend to all these considerations when ruling on the kinds of issues raised by the parties here—and should understand that rulings about the scope of the waiver that is occasioned by invoking advice of counsel can affect substantially the incentives that drive litigant behavior and the fairness of the adjudicatory process in patent cases. If the scope of the waiver is so broad that it reaches all otherwise protected communications and documents that have any bearing on what the defendant and all her counsel think about the key liability issues, a sophisticated party might well decide that relying on advice of counsel would deprive her of something essential to her ability to defend herself—a confidential relationship with her trial lawyer.

Fear of losing the confidentiality of that relationship can be especially strong in patent cases because of the importance parties tend to ascribe to how the word game is played. An opponent who could have access to all of a party's and her lawyer's thoughts

---

27. According to one lawyer who toils in these fields, "almost every patent infringement complaint includes an allegation of willfulness." David O. Taylor, "Wasting Resources: Reinventing the Scope of Waiver Resulting from the Advice-of-Counsel Defense to a Charge of Willful Patent Infringement," 12 Tex. Intell. Prop. L.J. 319, 323 (Winter 2004).

about how to construe key terms, and how to argue such issues, would be perceived as enjoying a substantial litigation advantage. Fear of conferring such an advantage on an opponent might lead defendants to conclude that the risks that accompany an invocation of the advice of counsel defense exceed the risks of not invoking that defense. Thus, courts that insisted on imposing very broad waivers would risk forcing defendants to chose between two potentially significant unfairnesses: (1) losing the confidentiality of the relationship with trial counsel that her opponent (often a competitor) would continue to enjoy, or (2) losing the ability to present the most effective defense to a claim of willfulness (sophisticated advice of counsel). The reality and magnitude of the pressure this quandary imposes on parties in patent cases is well-illustrated by the extraordinary volume of professional literature that has been devoted to it.[28]

The forseeability (by both parties) of this quandary, and of the fact that either choice would deliver an advantage to the plaintiff, also could unfairly distort the settlement dynamic in patent cases. A plaintiff who could count on the court reading the scope of the waiver very broadly would be able to use a defendant's fears of intrusion and of an un-

even litigation playing field to gain leverage in settlement negotiations that had no roots in the merits of the case. And fear of being forced to make an early election[29] between the two unattractive paths could unfairly pressure some defendants to accept imbalanced terms of settlement before they could acquire the information, through discovery and/or motion activity, that would be needed to make a settlement decision driven by the respective merits of the parties' positions.

Indirectly, giving very broad scope to this waiver also could tend to frustrate, in some measure, some of the underlying goals of patent law. A party who foresees that he will not try to use advice of counsel as a defense might be less likely to seek that advice before engaging in conduct that might invade patented rights—and might be less likely to secure a lawyer's input when trying to determine whether he could design around an issued patent.[30]

Informed by all these considerations, we turn to address the remaining issues raised by Sharper Image's motion.

## THE SUBJECT MATTER SCOPE OF THE WAIVERS

■ I ruled in May that the subject matter scope of Kaz's waiver was not limited to

28. See, e.g., Taylor, "Wasting Resources: Reinventing the Scope of Waiver Resulting from the Advice–of–Counsel Defense to a Charge of Willful Patent Infringement," 12 Tex. Intell. Prop. L.J. 319 (Winter 2004); Powers and Carlson, "The Evolution and Impact of the Doctrine of Willful Patent Infringement," 51 Syracuse L.Rev. 53 (2001); Hofer, Tabor, and Pioli, "Willful Infringement Issues in Patent Cases," 572 PLI/Pat 969 (1999); Lydon, "A Purge Defense to Willful Patent Infringement," 80 J. Pat. & Trademark Off. Soc'y 392 (June 1998); Markman, "Patent Opinions, Privileges, and the Advice of Counsel Defense to Claims of Willful Infringement: Litigation Counsel Caught in the Crossfire," 19 Hastings Comm. & Ent. L.J. 949 (1997); Bolan and Rooklidge, "Imputing Knowledge to Determine Willful Patent Infringement," 24 AIPLA Q.J. 157 (1996); and Dragseth, "Coerced Waiver of the Attorney–Client Privilege for Opinions of Counsel in Patent Litigation," 80 Minn. L.Rev. 167 (1995). See also the many articles cited in note 312 (page 20–419) of section 20.03[4][b] of Vol. 7 of *Chisum on Patents* (LexisNexis 2003).

29. Concern about such pressures has led some courts to extend the deadline for making the election to a point well into the pretrial period—

or even to bifurcate the issue of willfulness, permitting discovery and motion activity directed solely to willfulness issues only after a finding of infringement and validity in a first trial. Bifurcation, however, often is perceived as impractical.

30. As noted in the text, to encourage invention and progress, the law recognizes a party's right to "design around" a patent. Thus, "designing around" another person's patent is not tainted or underhanded activity, but something to be encouraged. Which elements a new design must have in order to steer successfully around a patent, however, can be a very difficult question. The upshot is that a party who wants to lawfully enter a market in which patented products already are available often will feel a need to seek independent advice of counsel as the party designs and develops its product. The process of securing such advice should reduce the likelihood that another person's rights will be invaded and can be essential to providing the newcomer to the field with the level of confidence he needs to move forward with a product or process that really would constitute an improvement. In these ways, seeking advice of counsel is a social good.

infringement but also reached validity and enforceability. That ruling was based on an erroneous factual assumption: that the advice of counsel on which Kaz had elected to rely addressed all three subjects. In fact, the advice on which Kaz has elected to rely addresses only the issue of infringement.[31]

It is theoretically possible, of course, that disclosure of otherwise protected communications between Kaz and its opinion counsel that addressed only issues of validity or enforceability might yield some evidence about what Kaz really thought or should have thought about infringement (when it decided not to quit this commercial battlefield). But the mere possibility that some such evidence might surface is not sufficient to justify intrusion into these separate subjects. A court should be persuaded that there is a substantial prospect of uncovering evidence of real probative moment (taking into account other sources of evidence on the issue) before the court should consider expanding the subject matter scope of a waiver beyond the topics addressed in the legal advice on which defendant contends he relied.

In the absence of such a showing there is relatively little risk that limiting the subject matter scope of the waiver would unfairly impair the plaintiff's ability to litigate the reality and reasonableness of defendant's alleged reliance on the advice that the defendant exposes to the trier of fact. On the other hand, expanding the subject matter scope of the waiver to all communications that have any bearing on what defendant thought or was advised about any of the liability issues likely would cause considerable harm to competing interests. Such interests include the policies that inform the attorney-client privilege and the work product doctrine, as well as the courts' interest in promoting appropriately focused and efficient litigation and in not providing one side of a dispute with tactical advantages or with leverage not grounded in the merits of the parties' positions.

Because Sharper Image has not persuaded the court that expanding the subject matter

scope of the waiver to include communications about validity or enforceability likely would yield evidence of real probative consequence on the issue of willfulness, the court will limit the waiver to communications that address infringement.

## PROTECTED MATERIAL RELATED TO KAZ'S PENDING PATENT APPLICATIONS

■ Sharper Image also contends that the subject matter scope of Kaz's waiver should reach otherwise protected communications and documents related to two patent applications that Kaz has pending. Kaz has produced the applications themselves, as well as some non-privileged documents related to the applications. It has declined, however, to produce documents related to the application process that fall within the scope of the attorney-client privilege or the work product doctrine. Kaz contends that these documents are not covered by the waiver that follows from its decision to defend against the allegation of willful infringement of the patents in suit by relying, in part, on the advice of its patent counsel that the Environizer does not infringe those specific patents.

In its two pending applications, one for a design patent and one for a utility patent, Kaz claims, on grounds visible to Sharper Image in the applications themselves, that aspects or features of the Environizer product line are patentable. Sharper Image contends that the communications Kaz refuses to disclose likely contain evidence that is relevant to what Kaz has been advised about the relationship between its products and the patents in suit—at least in part because the applications address aspects of the product that Sharper Image accuses here.

Sharper Image's argument about the relevance of this material might have been sufficient under the standard that fixed the outer bounds of discovery before Rule 26 was amended in 2000—but it is not clear that the argument is persuasive under the standard that applies now.[32] In the case at bar, the

---

**31.** The court has examined an unredacted version of the Wolf Greenfield opinion letter of July

23, 2002, and thereby has confirmed that the letter addresses only infringement issues.

**32.** Before it was amended in 2000, Rule 26(b)

focus of comparison is between the accused product and the specific claims of the patents on which Sharper Image has sued. The focus of comparison is *not* between the pending applications and those claims. This difference leaves the court uncertain about how much probative light is likely to be shed on the question before us (whether Kaz reasonably relied on the Wolf Greenfield opinion) by communications Kaz had with its patent counsel as they worked on the applications for as yet unissued patents.

The court's uncertainty about the likely relevance and probative utility of evidence from these sources is important because the issue here is not simply whether the secret communications that occurred in connection with the pending applications fall within the reach of Federal Rule of Civil Procedure 26(b), but whether, even if they do, the court should strip them of the protections to which they otherwise would be entitled because Kaz has elected to assert the advice of counsel defense to the willfulness claim. To prevail in a dispute about whether a party should lose its protections under the attorney-client privilege and the work product doctrine, a party should be required to do substantially more than make a showing of arguable relevance. There is even greater force in this point in a setting like this, where the two parties are commercial competitors and where the protected communications may well involve matters of considerable competitive sensitivity. If intrusions into such protected zones are to be ordered, they must be clearly justified by a substantial

countervailing consideration. Because we are addressing scope of waiver, that countervailing consideration must sound fundamentally in fairness.

Would preserving the protection of these communications impose an unfair litigation disadvantage on Sharper Image? Would permitting Kaz to maintain the confidentiality of these communications enable it to pick and choose among confidential communications addressing the same subject, disclosing those that tend to support the conclusion that its reliance on the Wolf Greenfield opinion letter was real and reasonable, while hiding from Sharper Image and the court communications that would suggest that Kaz either did not rely on that opinion or that any such purported reliance was unreasonable?

Sharper Image has not persuaded us [33] that there is a substantial risk of any such unfairness. Even if the communications in issue occurred during the period Kaz was receiving and assessing the advice on which it now says it relied (an assumption not made clear by the record), differences between the subjects addressed in the two distinguishable settings, as well as differences between the purposes and targets of the communications, reduce appreciably the likelihood that giving Sharper Image access to this information would add materially to its ability to litigate fairly the reality and reasonableness of Kaz's reliance on the Wolf Greenfield opinion letter.

This is not to say that there is little likelihood that there would be any relationship or

---

fixed the outer bounds of discovery in terms of the "subject matter involved in the pending action." The amended version of this provision, clearly intended to shrink the universe of presumptively accessible material, declares that matter sought through discovery must be "relevant to the claim or defense of any party."

**33.** In this specific setting, we think the burden of persuasion at this juncture should be placed on the plaintiff. The court already has imposed substantial disclosure obligations on Kaz; the protections that Kaz otherwise would enjoy already have been sacrificed to a considerable extent. As will be seen in subsequent sections of this Opinion and Order, the court is ordering Kaz, for the period preceding the filing of the first of these consolidated cases, to disclose all communications and to disgorge all documents

that reflect or relate to confidential advice it received (from any source) about whether the Environizer might be deemed to infringe any of the patents in suit—as well as about what Kaz thought or did in response to that advice. And for the period after Sharper Image filed its claim, the court is compelling disclosure of communications on this subject (and related documents) between Kaz and either Wolf Greenfield or Darby & Darby. To further probe the question of what advice was actually given to Kaz on this subject, the court has ordered Wolf Greenfield to disclose even the work product documents whose contents were never shared with Honeywell or Kaz. In this context, when the issue is whether to extend the scope of the waiver even beyond these intrusive realms, the burden of justification should be placed on the would-be intruder.

overlap between the subjects of the two sets of communications—in fact, some relationship seems likely. Given the differences in subjects and purposes of the two sets of communications, however, it appears even more likely that those relationships would be indirect, i.e., that arguments about whether Kaz reasonably relied on the Wolf Greenfield opinion letter that were based on communications made in connection with applying for the new patents would be based on inferencing through too many elements or stages to have any substantial effect on the fact finding process in our case. Because Sharper Image has failed to persuade us that fairness requires this extension of the scope of the waiver, we DENY its motion to compel Kaz and Honeywell to disclose protected[34] communications and documents related to Kaz's two pending patent applications.

## SHARPER IMAGE'S PURSUIT OF PROTECTED DOCUMENTS AND COMMUNICATIONS INVOLVING ANY LAWYER AT ANY TIME

Sharper Image asks the court to compel Kaz and Honeywell to disclose protected materials that were generated at any time by, and confidential communications that took place at any time with, any lawyer or law firm that had any dealings with either of the two defendants and that relate to the liability issues in this litigation. This demand is extremely broad, even when limited by the court's order that confines the subject matter of the waiver to whether the Environizer infringes any of the patents in suit.

Two primary sets of variables are in issue as we analyze Sharper Image's demand for this discovery. One set is temporal: when did the communication occur (or when was the document generated) in relation to notice of the relevant patents, the decision to market the accused product, and commencement of the litigation. The second set of variables is comprised of the various lawyers and law

firms that have had dealings with the defendants in relation to the products and patents in suit. These two sets of variables must be considered simultaneously. For reasons we will explain, our dispositions turn on both *who* was involved (*which lawyer, playing what role*) and *when* the communication occurred or the document was generated.

### WOLF GREENFIELD

■ Wolf Greenfield wears only one hat in this matter: opinion counsel. It is advice from Wolf Greenfield that Kaz has chosen to put in issue in this litigation. More specifically, Kaz contends that it was not guilty of willful infringement because in marketing the Environizer (its accused product) is has relied in good faith on advice from Wolf Greenfield that the Environizer does not infringe any claim of the patents in suit.

Because Kaz has elected to continue to market its accused product,[35] and because Kaz contends that in so doing it continues to rely in good faith on Wolf Greenfield's opinion that the Environizer does not infringe the Sharper Image patents, Kaz has made a continuing issue of what Wolf Greenfield has communicated to Kaz on the infringement issue. In this circumstance, it would be unfair to permit Kaz to disclose only the communications from Wolf Greenfield that preceded Kaz's decision to proceed with the marketing of the Environizer or the filing by Sharper Image of the first of these related lawsuits. We therefore hold that Kaz's waiver reaches all communications between Wolf Greenfield and Kaz (communications running in either direction) on the subject of infringement (by the Environizer) of the patents in suit, regardless of when the communications occurred.

### DARBY & DARBY

■ The law firm of Darby & Darby (Darby) has worn several hats in the course

---

**34.** We use the short-hand phrase "protected" to embrace communications or documents that are covered by the attorney-client privilege and/or the work product doctrine.

**35.** One alternative course that was open to Kaz (at least in theory) was to withdraw this product

from the market shortly after learning that Sharper Image claimed that the Environizer infringed the patents in suit. Had Kaz taken that course of action our analysis about the temporal reach of the waiver would take a different shape—and might well yield a different ruling.

of its dealings with Kaz. Apparently for some time it has provided Kaz with a range of services, performing functions akin to a general counsel. It advised Kaz during the negotiations to purchase Honeywell's Consumer Products division. It has helped Kaz prosecute patent applications. It has given Kaz its own views about the Wolf Greenfield opinion letter and about whether the accused products infringe the patents in suit. And it served for a time as one of Kaz's litigation counsel in the pending cases.

In the paragraphs that follow we will analyze separately communications and documents from the period before the litigation commenced and communications and documents from the period after Sharper Image served Kaz with its initial complaint.[36]

Kaz concedes that during the earlier of these two periods it received input from Darby about the Wolf Greenfield opinion letter. Moreover, because of the apparently longstanding and multi-faceted relationship between Kaz and Darby, it would hardly be surprising if Kaz and Darby communicated about whether the Environizer infringed the Sharper Image patents during the period that Darby helped Kaz negotiate the purchase of Honeywell's Consumer Products division (the division that then held the rights to the Environizer—rights sold to Kaz in the transaction).

By contending that its decision to proceed with the marketing of the Environizer was made in the good faith belief that its product did not infringe the Sharper Image patents, and that that good faith belief was informed primarily by what would otherwise be privileged advice from counsel, Kaz has placed in issue all the information and views about infringement that came to it during the prelitigation period from any source—including any lawyer. Evidence about what Kaz heard on this subject during this period from any of its lawyers is central to litigating the willful infringement claim. Because of that centrality it would be unfair to Sharper Image to permit Kaz to disclose and use for its litigation purposes only the communications and documents from this universe that support Kaz's side of the story.

For these reasons, the court GRANTS Sharper Image's motion to compel disclosure of all communications between Kaz and Darby that occurred before Sharper Image filed its complaint and that relate to whether the Environizer might be deemed to infringe any of the patents in suit. The court also ORDERS disclosure of any communications during this period between Kaz and Darby that relate to any of Wolf Greenfield's views on this subject. For reasons we set forth in some detail in *Electro Scientific Industries, Inc. v. General Scanning, Inc.*, 175 F.R.D. 539, 544–547 (N.D.Cal.1997), we also ORDER Darby to disclose work product on these subjects (and from this period) even if that work product was not shared with Kaz.

The substantially more difficult question is whether the waiver should reach communications between Darby and Kaz that occurred after Sharper Image served the complaint. It is the fact that during this period Darby donned an additional hat, as one of Kaz's litigation counsel, that makes this a more difficult question. Several case-specific considerations, however, persuade us to extend the scope of the waiver into this period for

36. In the case at bar, only a couple of months elapsed between the close of the period during which Kaz was required to conduct its due diligence and the date Sharper Image served the complaint. Moreover, Kaz's course of conduct did not change from the period it acquired the duty of due diligence through the period after Sharper Image formally initiated the litigation: Kaz continued to market the accused products and continued to insist in so doing that it relied in good faith on advice of counsel that its conduct did not infringe Sharper Image's rights. Given these circumstances, there are only two periods that we need to consider separately, the periods before and after commencement of the litigation.

In some other factual settings, however, courts might need to further divide the temporal landscape for these kinds of analytical purposes. If, for example, there was a substantial period between the date the defendant was put on notice of the patent and the alleged infringement, on the one hand, and, on the other, the date the complaint was filed, and if the defendant continued to market the accused product after notice but then withdrew the product when plaintiff served the complaint, courts would be well-advised to consider the waiver issues separately for the middle period (the period between the notice and the commencement of litigation).

communications between Kaz and Darby about whether the Environizer infringes any of the patents in suit.

The first of these considerations (not necessarily in order of analytical weight) is that Darby served as Kaz' principal litigation counsel for only a short period during the early stages of this litigation; Robbins Kaplan formally moved into that role a couple of months after the complaint was filed. Second, it appears that nothing of real litigation moment occurred during Darby's brief tenure as litigation counsel. No depositions were taken. No consequential motions were litigated. No major case management concessions were made. No serious settlement discussions occurred. Because of these facts, an order requiring disclosure of the post-complaint communications (if any) between Darby and Kaz on the subject of whether the Environizer infringed the patents in suit would cause relatively little harm to the policies that inform the work product doctrine and would not deeply invade Kaz's interest in being able to develop and sustain a confidential relationship with its lead trial counsel (Robins Kaplan).

Such an order, however, could cause serious intrusions into matters the attorney-client privilege is designed to protect. This fact forces us to determine whether, under appropriate waiver analysis, such intrusions are justified in the circumstances here presented. Would declining to extend the waiver to these communications unfairly disadvantage Sharper Image as it probes and challenges Kaz's contention that competent advice of counsel is central to its belief that selling the Environizer does not infringe claims in the patents in suit?

While the answer is not obvious, we conclude that it is yes.

As we noted, above, Darby has enjoyed a long-standing and multi-faceted relationship with Kaz. That fact suggests that Kaz has developed considerable confidence in Darby and would be inclined to heed Darby's legal advice with special care. It also is significant that the legal work Darby has done for Kaz includes helping prosecute patents (some of which may cover features of the accused product)—suggesting that Kaz has reason to believe that Darby is well schooled in the art of drawing infringement lines (perhaps especially with respect to the kinds of products in issue in this litigation).

We also note that in the period before the complaint was filed Kaz received counsel from Darby about the Wolf Greenfield opinion letter. Moreover, Darby served as Kaz's legal advisor during the negotiations with Honeywell in which Kaz purchased the right to market the Environizer. It would not be surprising if, while helping Kaz in these negotiations, Darby formed and shared views about the value that should be ascribed to the right to market the Environizer, a value that could not be assessed reliably without consideration of patent issues. And if Darby lawyers offered opinions in this subject area they likely would have a considerable interest in their vindication in this litigation.

Because Darby enjoyed a special relationship with Kaz, and because that special relationship embraced matters tightly interwoven with the pending dispute, it would seem reasonable to infer that Kaz would give considerable weight to Darby's views about infringement. Stated differently, it is not unlikely that Darby's views about whether the Environizer infringed the patents in suit would play a major role in shaping Kaz's views on that subject. Moreover, by continuing to market the accused product, and by continuing to justify that marketing largely on the basis of advice of counsel, Kaz has made its post-complaint views about infringement, and the related advice it has received from at least some of its counsel, a continuing issue. This fact is of some significance in our disposition of the dispute as to Darby—because of the character of Darby's relationship with Kaz—even though, as we explain in the next section, this fact (by itself) is not sufficient to justify invading post-complaint confidential communications between Kaz and Robins Kaplan, Kaz's primary trial counsel.

We conclude that to give Sharper Image a fair opportunity to probe what Kaz's views about infringement really have been during all the periods Kaz has elected to make relevant, and to assess the reasonableness of

Kaz's decision to continue to market the Environizer on the basis of those views, it is necessary to permit Sharper Image to discover what Kaz and Darby communicated to one another on this subject even after the complaint was served. The content of such communications might have considerable probative significance on the issue of Kaz's good faith reliance on advice of counsel. On the other hand, because Darby served so briefly as Kaz's lead trial counsel, compelling Kaz and Darby to disclose their post-complaint communications about infringement would not cause significant harm to Kaz's interest in having a confidential relationship with its primary trial counsel. Given these findings, the balance tips clearly in favor of extending the waiver into this arena.

We therefore ORDER Kaz and Darby to disclose all their communications about whether the Environizer infringes any of the patents in suit, regardless of when the communications occurred. Darby also must disclose its related work product, whether it shared the contents of that work product with Kaz or not.

### ROBINS KAPLAN

The only role that the law firm of Robins Kaplan has played is as Kaz's lead trial counsel. As far was we know, Robins Kaplan had no contact with anyone about the matters embraced in this litigation before Sharper Image served its complaint. However, if, in the period before the complaint was served, there were communications between Kaz and Robins Kaplan about whether the Environizer infringed the Sharper Image patents, the waiver would reach those communications. Such communications could have substantial evidentiary implications for the central issues raised by Kaz's invocation of the advice of counsel defense—and ordering their disclosure (in the circumstances of this case) would do little harm to Kaz's interest in maintaining a confidential relationship with its trial counsel.

The next question we address is much more difficult. Does the waiver reach communications between Kaz and its lead trial counsel—about whether the Environizer infringed the patents in suit—that occurred *after* Sharper Image served its complaint? We hold that it does not.

We base this holding on the following considerations. First, in patent litigation between competitors, disabling a defendant from having a confidential relationship with its lead trial counsel about matters central to the case would cause considerable harm to the values that underlie the attorney-client privilege and the work product doctrine. Second, because of the perceived centrality to this kind of litigation of word gaming, there is a considerable risk that a defendant in these kinds of cases who could not have a confidential relationship with its lead trial counsel would be at a considerable disadvantage. In some circumstances, the magnitude of that disadvantage could threaten basic due process (fairness) values and could dislodge essential underpinnings of the adversary system. Third, in patent litigation a *perception* that the defendant's ability to maintain a confidential relationship with its trial counsel was seriously impaired would distort the balance of power between the parties, giving plaintiffs unfair leverage in settlement negotiations. Such a perception also would encourage the filing of claims of willful infringement without regard to their merit.

A defendant who understood that invoking the advice of counsel defense would disable him from communicating in confidence with his trial counsel about matters critical to liability would feel great pressure to forego the right (conferred on him by patent law) to defend himself on this important ground. Such a defendant might even be discouraged from seeking legal advice before deciding whether to proceed to market with a product in an arena in some part of which patents had already issued. Doctrine that discouraged parties from seeking legal advice in these settings also would discourage parties from trying in good faith to design around issued patents—thus undermining a purpose of substantive patent law whose importance grows with the reach of technology and with the expansion of the spheres covered by issued patents.

Are there competing fairness considerations, in the specific circumstances presented in the case at bar, that would justify

imposing or risking such serious harms? We have concluded that there are not.

This conclusion is supported by several considerations. The first (not necessarily in order of importance) is the fact that when the parties litigate the issue of whether Kaz's reliance on the advice of counsel was "reasonable" (an essentially objective inquiry), the primary focus very likely will be on the "competence" (or "objectivity") [37] of the Wolf Greenfield opinion letter of July 23, 2002—an issue to which communications that occurred much later between Kaz and its trial counsel (not Wolf Greenfield or Darby) are quite likely to be deemed irrelevant. Second, as a result of the other rulings we have entered in this dispute, plaintiff will have access to a great deal of otherwise confidential information that is appreciably more likely to have probative utility on the issues of whether Kaz in fact relied on the Wolf Greenfield opinion and, if so, whether that reliance was reasonable.

More generally, the evidence we already have ordered Kaz, Honeywell, Wolf Greenfield, and Darby to disclose is likely to have far more probative significance for any of the issues that will be contested under the willfulness claim than evidence that might emerge from confidential communications that occurred between Kaz and Robins Kaplan after the litigation was under way. This is true in part because Robins Kaplan was not in the picture during the most critical periods—when Honeywell and Kaz solicited the views of patent counsel and considered whether to proceed to market with the accused product. Moreover, Honeywell and Kaz sought the views of Wolf Greenfield and of Darby in their capacities as experts in patent law—probably anticipating that it might become necessary to use those views to defend against claims of infringement.

In sharp contrast, Kaz did not turn to Robins Kaplan to get advice about the reach of Sharper Image's patents. Instead, when Kaz retained Robins Kaplan, which it did only after the litigation was under way, it was to litigate, and only to litigate.

Because of the different capacities in which the law firms were consulted, because of the different functions they were asked to perform, and because of the different time frames in which the communication between them and Kaz primarily occurred, we can expect that there would be considerable differences in the probative value (for the willfulness issues) of evidence from their communications. When the parties litigate whether Kaz reasonably relied on advice of counsel, the trier of fact is likely to ascribe considerable weight to evidence about what advice Kaz was given by Wolf Greenfield and by Darby, but very little weight, if any, to opinions that Robins Kaplan may have expressed to Kaz in the course of litigating this case.

Sharper Image might counter by emphasizing that willful infringement is a continuing tort [38] and, therefore, that Kaz had a continuing duty to assess the reasonableness of its reliance on the Wolf Greenberg opinion letter—and then to withdraw the accused products from the market when it became clear (as plaintiff will argue it should have become) that the Wolf Greenfield reasoning and conclusions were not sound. Under this argument, every communication about infringement between Kaz and any lawyer at any time (before entry of final judgment) would be relevant, i.e., probative of what legal advice Kaz received about infringement and whether Kaz reasonably could have continued to believe that selling the accused products did not invade plaintiff's patent rights.

There is some surface appeal to this line of argument, but it loses most of its force on closer examination, at least in the circumstances presented in this case. While the authorities confirm that willful infringement is a continuing tort, it is likely that in most cases the principal significance in the real world of that notion is in the arena of damages. The fact that a defendant's "duty" not to willfully infringe is "continuing" justifies imposing damages on him for the consequences of his wrongful conduct over the

---

**37.** As that word was used in *Minnesota Mining and Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.,* 976 F.2d 1559, 1580–81 (Fed.Cir.1992).

**38.** *See, e.g., Pall Corp. v. Micron Separations, Inc.,* 66 F.3d 1211 (Fed.Cir.1995).

entire period that conduct continued. In the case at bar, it is unlikely that denying Sharper Image access to confidential communications between Kaz and its trial counsel that occurred after the complaint was filed will deprive Sharper Image of any of the relief to which it is entitled under the law.

This is so, in part, because the primary thrust of Sharper Image's willfulness claim is that Kaz knew (or certainly should have known) even before it decided to take the Environizer to market that this product infringed the patents in suit. Sharper Image contends that Kaz should have understood this (or actually did understand it) well before the complaint was filed. Sharper Image further contends that Kaz knew or should have known that the Wolf Greenfield opinion letter (which Kaz received at least two months before being served with the complaint) was "incompetent" and could not support a good faith belief that the Environizer did not infringe the Sharper Image patents. So, under plaintiff's primary theory, the tort commenced before the complaint was filed, when Kaz first took the Environizer to market, and has continued, uninterrupted, ever since. If Sharper Image prevails on this theory, it will be entitled to damages for the entire period preceding entry of judgment.

Rulings the court already has made give Sharper Image access to the full range of evidence that might support this contention—including, for the crucial period before the complaint was filed, all the otherwise confidential communications between Kaz and any of its lawyers about whether the Environizer infringes the subject patents.

In theory, a breach of the duty not to willfully infringe could first occur after a lawsuit was filed—during the period between service of the complaint and commencement of trial (a period that could span a number of years in patent litigation). *See, e.g., Pall Corp. v. Micron Separations, Inc.,* 66 F.3d 1211 (Fed.Cir.1995); *Corning Glass Works v. Sumitomo Electric USA Inc.,* 671 F.Supp. 1369, 1401 (S.D.N.Y.1987). In theory, a defendant who relied reasonably on advice of counsel that he received before litigation began could receive later, during the pretrial period, information or advice that made it

clear that he was in fact infringing—and thus made it clear that the advice he originally received was at least wrong, it not incompetent. *See Studiengesellschaft Kohle mbH v. Dart Industries Inc.,* 666 F.Supp. 674, 4 U.S.P.Q.2d 1817 (D.Del.1987), *aff'd* 862 F.2d 1564 (Fed.Cir.1988). Thus, in theory, a defendant who had not breached the duty not to infringe willfully in the period before being served with the complaint could begin breaching that duty at some point during the pretrial period.

The confluence between this kind of theory and reality probably is rare. More to the point here, Sharper Image has directed our attention to nothing (by way of evidence or changes in circumstance) that would even begin to support such a theory in the case at bar. Unlike the defendant in *BASF Aktiengesellschaft v. Reilly Industries, Inc.,* 283 F.Supp.2d 1000, 1007 (S.D.Ind.2003), Kaz has not radically changed (in mid-litigation stream) the bases for its contention that the Environizer does not infringe. Kaz continues to rely on the opinion letter from Wolf Greenfield that it received in July of 2002, many weeks before Sharper Image sued. Nor are we aware of any other circumstance that would raise a suspicion that Kaz has been advised by its trial counsel either that the Environizer infringes the Sharper Image patents or that the Wolf Greenfield letter was incompetent. There is nothing but raw speculation to support such a notion—and raw speculation is not enough to justify the substantial harms that obviously would flow from an order that permitted Sharper Image to invade Kaz's confidential relationship with its trial counsel on a subject (infringement) at the heart of this case.

It also is significant that orders we are entering will permit plaintiff to search in significant places for evidence that might disclose whether there is anything to the speculation that Kaz might have begun willfully infringing only sometime after Sharper Image filed suit. We are ordering Kaz, Honeywell, Wolf Greenfield, and Darby to disclose *all* of their otherwise confidential communications that relate to whether the Environizer infringes the Sharper Image patents, including any such communications that have

occurred after the complaint was filed. Because Wolf Greenfield is the source of the advice of counsel that Kaz is invoking in its defense, and because it is the "advice" from Wolf Greenfield and Darby that the trier of fact is most likely to require Kaz to heed (and on which the trier of fact is most likely to focus when determining whether Kaz has proceeded in good faith), we have no reason to believe that plaintiff will suffer any real unfairness by being denied access to Kaz's confidential communications with its lead trial counsel about infringement.

For all these reasons, we DENY Sharper Image's motion to compel disclosure of all confidential communications between Kaz and Robins Kaplan that occurred after the complaint was filed and that relate to any of the liability issues.

### REED SMITH, PATTERSON BELKNAP, AND HOWARD RICE

There are three additional law firms that may have communicated with Kaz and/or Honeywell in connection with the pending litigation or about the patents and products in issue. Reed Smith and Howard Rice have acted as local counsel for Kaz—but their roles have been quite limited. Honeywell apparently consulted Patterson Belknap for some purpose (apparently limited) related to the subjects of this litigation. While it is unlikely that communications between defendants and any of these lawyers would shed light on the willfulness claim, the analytical path we have followed, above, leads us to conclude that communications between any of these lawyers and either defendant that occurred before Sharper Image filed its complaint and that relate to whether the Environizer infringes any of the patents in suit must be disclosed. On the other hand, because their roles seem to have been so limited, and their views on the infringement questions would be of such little moment in the willfulness litigation, we decline to order disclosure of any post-complaint communications between these counsel and defendants.

### REDACTIONS FROM THE WOLF GREENFIELD OPINION LETTER OF JULY 23, 2002

Kaz deleted two sections of the Wolf Greenfield opinion letter of July 23, 2002, when it produced the letter to Sharper Image. The court has reviewed an unredacted version of this letter *in camera.* The redactions from pages 15–16 were appropriately made; these paragraphs relate to a patent not in suit. Kaz has failed to persuade the court, however, that the redaction from page 6 can be justified on that ground—or on any other that the court knows. The court therefore ORDERS Kaz to disclose to plaintiff the material it redacted from page 6 of the Wolf Greenfield opinion letter of July 23, 2002.

### THE WOLF GREENFIELD OPINION LETTER OF APRIL 3, 2002

Kaz need not produce to Sharper Image the Wolf Greenfield opinion letter of April 3, 2002. This letter, which the court reviewed (without redactions) *in camera,* does not address any of the patents that Sharper Image contends are infringed by the Environizer.

### SUMMARY OF ORDERS

1. The court hereby VACATES paragraph number three (3.) of the "Order Following May 13, 2004, Hearing on Plaintiff's Motion to Compel," filed May 14, 2004, and REPLACES THAT PARAGRAPH WITH THE FOLLOWING DIRECTIVE: Kaz must disclose all communications (through any medium and in any form) from Wolf Greenfield to Kaz or Honeywell that relate to whether the Environizer might be deemed to infringe any claim in any of the patents in suit.

2. The subject matter scope of the waiver by Kaz is limited to whether the Environizer infringes any of the patents in suit.

3. Sharper Image's motion to compel defendants to disclose protected communications and documents made in connection with Kaz's two pending patent applications is DENIED.

4. Kaz's waiver reaches all communications between Kaz and Wolf Greenfield on the subject of whether the Environizer infringes any of the patents in suit, and all related work product (whether shared with

Kaz or not), whether made before or after Sharper Image initiated this litigation.

5. Kaz's waiver also reaches all communications between Kaz and Darby & Darby about whether the Environizer infringes any of the patents in suit, as well as all related work product (whether shared with Kaz or not), whether made before or after Sharper Image initiated this litigation.

6. For the period *before* Sharper Image initiated this litigation (by filing the first complaint in these consolidated actions), Kaz's waiver reaches all communications between it and Robins Kaplan about whether the Environizer infringes any of the patents in suit, as well as all related work product (whether shared with Kaz or not).

7. For the period *after* Sharper Image initiated this litigation, Kaz's waiver does *not* reach any communications (or documents related thereto) between Kaz and its lead trial counsel, Robins Kaplan, that otherwise qualify for protection under the attorney-client privilege and/or the work product doctrine.

8. For the period before Sharper Image initiated this litigation, Kaz's waiver reaches communications (and related documents) between Kaz and Howard Rice, Reed Smith, or Patterson Belknap on the subject of whether the Environizer infringes any of the patents in suit. The waiver does not reach any such communications/documents made after the initial complaint was filed.

9. Kaz must disclose to Sharper Image the material redacted from page 6 of the Wolf Greenfield opinion letter of July 23, 2002. Kaz need not disclose the material redacted from pages 15–16 of that letter.

10. Kaz's waiver does not reach the Wolf Greenfield opinion letter of April 3, 2002.

IT IS SO ORDERED.